IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2025

IN RE ZARIAH H.[1] ET AL.

**Appeal from the Circuit Court for Bradley County**
**Nos. V-23-329, V-23-327     Michael E. Jenne, Judge**

_____

**No. E2024-00661-COA-R3-PT**

_____

A father appeals the termination of his parental rights to one minor child.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Wilton Marble, Cleveland, Tennessee, for the appellant, Mark M.

Philip M. Jacobs and Chandler I. McNabb, Cleveland, Tennessee, for the appellees, Gennie C., John C., and Eva W.

Jessica M. Conine, Chattanooga, Tennessee, for the appellee, Victoria H.

Jeff Davis, Hixson, Tennessee, Guardian ad Litem.

**OPINION**

**BACKGROUND**

This is a termination of parental rights case involving a father and his minor son, Remi M. (the "Child").  Victoria H. ("Mother") and Mark M. ("Father"), who are not

_____

[1] This Court's policy is to abbreviate the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

married, had the Child in February of 2021. The Child lived with Mother,[2] Father, and Mother's other two children, the Child's half-siblings, until the Tennessee Department of Children's Services ("DCS") removed all three children in July of 2022. According to the proof at trial, the incident giving rise to the Child's removal occurred on July 11, 2022, when Mother and Father were in their vehicle together with the Child and began arguing. During this argument, Father sprayed paint[3] in Mother's face and told Mother he was going to have sexual relations with Mother's friends. Father then exited the car, and Mother stepped on the accelerator and ran over Father with the vehicle. Mother left the scene, and police arrested her shortly thereafter. Mother was charged with aggravated assault, and DCS removed the Child and his siblings from the parents' custody. Gennie C. filed a petition seeking temporary custody of the Child, which the Juvenile Court for Bradley County granted following a hearing on July 26, 2022. The Child's half-sister, Zariah, was placed with Gennie C.'s sister.[4]

The Child remained in Gennie C.'s custody following his removal from Father. At the time of the Child's removal, Father was on probation for aggravated burglary, although the details of that criminal matter are not in the record. Father testified that he pled guilty to the burglary charge in April of 2022 and received six years of supervised probation. Following the Child's removal in 2022, Father and Mother remained in an on-again-off-again relationship and intermittently resided together in various places. Father testified that he was briefly incarcerated in Bledsoe County in early 2023. He completed a thirty-day rehabilitation program in September 2023 but later relapsed and began smoking marijuana again. Father has seen the Child once, very briefly, since DCS removed him.[5] Father was arrested again in February of 2024 after being pulled over in McMinn County; the officers found Father to be in possession of marijuana, methamphetamine, and drug paraphernalia. Consequently, at the time of trial in March of 2024, Father was incarcerated for violating the terms of his probation and did not know his release date. He testified that he might have to "flatten" his full sentence.

---

[2] Mother's parental rights have been terminated, and she is not participating in the present appeal. Mother is mentioned only for context.

[3] Father testified that he had spray paint in the car because he has a habit of doing graffiti around town.

[4] Gennie C.'s nephew, Caleb M., also shares a child, Jessalin M., with Mother. That child is in Caleb M.'s custody. Accordingly, Gennie C. is the aunt of the Child's half-sibling and has known Mother and Father for several years. While Remi M. is the only child at issue in this appeal, Mother's rights to both Remi and Zariah were at issue in the trial court; thus, Zariah is also mentioned for context. This is also why the trial court's orders mention "children" as opposed to only the Child.

[5] The parties all reference a no-contact order between Father and the Child. However, it is unclear from the record what precipitated that order, and the order itself is not in the record.

Gennie C. and her husband, John C. (hereinafter, "Petitioners"), filed their petition to terminate both parents' rights on May 12, 2023, in the Circuit Court for Bradley County (the "trial court"). As to Father, Petitioners alleged five statutory grounds for termination: failure to support, failure to visit, persistent conditions, failure to manifest an ability and willingness to assume custody of the Child, and failure to establish paternity. Father answered the petition, pro se, on June 20, 2023.

The trial court held a final hearing on March 8, 2024, at which Mother, Father, Petitioners, Father's mother, and Zariah's custodian all testified. The bulk of the proof at trial centered on Mother and her history of substance abuse, as well as the domestic incident leading to her children's removal by DCS. Mother and Father both testified about having a toxic relationship with one another and detailed instances of domestic violence. Mother testified that she intentionally hit Father with her car on July 11, 2022. For his part, Father detailed an incident that occurred in 2021:

A. Yeah. In 2021 we were getting kind of lively with each other in the driveway and I had grabbed her by her hair and was screaming at her, F-U, F-U, and beating her head on the window in front of the kids in the backseat of the car.

When I took [the Child] out of the backseat and put him in the house I was coming back out to get the other kids out of the car so that we could finish our little discrepancy and she was already gone.

And then the police showed up about four minutes later, if that, and I just brought [the Child] out of the house and handed him to the police and then they kind of threw me in the back of the car. She had dropped those charges.

For their part, Petitioners testified that the Child is doing well in their care, although he was slightly delayed upon first coming into their home. The Child spends a lot of time with his half-sister, Zariah, who lives next door to Petitioners with Gennie C.'s sister. The Child also has a relationship with his other half-sister, Jessalin, who lives with her father nearby. The Child has visitation with his paternal grandmother once a week on Fridays, and the grandmother drives from Lula, Georgia to see the Child. According to the grandmother, she has come to have a good relationship with Petitioners, and they both love the Child. Petitioners testified that the Child has a bonded relationship with their two biological children who also reside in the home with the Child. Petitioners testified that they wish to adopt the Child.

The trial court took the case under advisement and entered its final written order on May 1, 2024. The trial court found that Petitioners failed to satisfy their burden of proof as to several of the alleged statutory grounds but ultimately concluded that Petitioners proved, by clear and convincing evidence, that Father failed to manifest an ability and

- 3 -

willingness to assume custody of the Child. The trial court also found that terminating Father's parental rights was in the Child's best interests. Father appeals to this Court.

## ISSUES

I.  Whether the trial court erred in terminating Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

II.  Whether the trial court correctly concluded that terminating Father's parental rights is in the Child's best interests.

Petitioners raise no additional issues in their posture as appellees.

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)). "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023). This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court recently explained, we employ a two-step process in reviewing termination cases:

> To review trial court decisions, appellate courts use a [] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002);

*In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

## DISCUSSION

### *Grounds for termination*

   a. Failure to manifest an ability and willingness to assume custody

The only statutory ground for termination found by the trial court was failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. This ground applies when

[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).[6] This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute

---

[6] In termination cases, we apply the version of the statute in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

- 5 -

requires "a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Regarding the second statutory prong,

[t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

As relevant,[7] the trial court in the present case found as follows regarding this statutory ground:

The court finds that Mother and Father have failed to manifest both an "ability" and "willingness" to personally assume legal and physical custody or financial responsibility of the children. "When evaluating ability, [courts] focus on the parent's lifestyle and circumstances." *In re Kyland F.*, 2020 WL 957647 at *6 (Tenn. Ct. App. Feb. 27, 2020). (Citations omitted).

\*       \*       \*

As to Father, he has not financially supported the minor child. Father has only visited with the minor child one time since the July 11, 2022 removal. He has another minor child with [another woman] that he has not seen since 2021. He has not had a driver's license since he was 17, he does not have a vehicle, and he has no place to live. According to Father, he is "homeless on the streets." Father also has an extensive criminal history as well as a history of illegal drug use dating back to when he was 17 years old. He has been incarcerated for a majority of the child's life. After the July 11, 2022 removal, Father failed a drug test and went back to jail. Between the time of removal and October 26, 2022, Father spent 70 days in jail. Father went back into jail on October 26, 2022 and did not get released until May 30, 2023 after the

---

[7] Some findings relating exclusively to Mother are omitted for brevity.

Petitions were filed. On or about August 15, 2023, Father went to a rehabilitation facility through September 14, 2023. While there, he was prescribed medications for mental disorders. Thereafter, he smoked [m]arijuana and failed a drug test. Then, on or about February 6, 2024, Father was arrested for possession of [m]ethamphetamine, possession of [m]arijuana, and possession of drug paraphernalia. Father pled guilty to possession of drug paraphernalia, and the 2 other charges were dismissed. This was a violation of his probation as related to his previous [a]ggravated [b]urglary conviction. Father has been incarcerated since the February 6, 2024 arrest. Father does not know if his 6 year [a]ggravated [b]urglary sentence will be flattened requiring him to serve all of his sentence. Per Father, the very soonest he could care for the minor children is in a year. Father also suffers from mental instability.

The court also finds that placing the minor child in Mother's and Father's legal and physical care and/or custody would pose a risk of substantial harm to the physical or psychological welfare of the children. "The use of the modifier 'substantial' indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not[]." *In re Braelyn S.*, 2020 WL 420008 at *17 (quoting *In re Maya R.*, 2018 WL 1629930 (Tenn. Ct App. April 4, 2018)). In addition to the above, and yet again, Mother and Father have a history of criminal illegal drug abuse. Mother and Father continue to fail drug tests. There is a risk to the minor children that they would be exposed to illegal drugs while in their care. One of the minor children has tested positive for drugs. On July 11, 2022, Father, Mother and Remi were in a vehicle at which time Mother and Father began to argue. This led to Father spraying paint on Mother's face and Mother running over Father in a vehicle, after which time, Father had to be treated at a local hospital for [a] broken leg. . . . [B]ased on Father's history, there [is] no indication to this court that when Father is eventually released [from] incarceration, Father is capable of maintaining stable employment, income, housing, transportation and sobriety. Simply put, neither Mother nor Father are fit to parent. As such, the court finds that based upon the facts in this case, placing the children in Mother's and Father's care and custody would pose a risk of substantial harm to the physical and/or psychological welfare of the young children. The court further finds that the risk of harm to the minor children is "substantial", meaning the risk is real and not merely minor, trivial, insignificant or a theoretical possibility.

Having reviewed the record, the evidence preponderates in favor of the trial court's factual findings regarding Father and section 36-1-113(g)(14). We agree that Father is not fit to parent the Child and that Father failed to manifest both an ability and willingness to parent. Father has been in and out of jail for the Child's entire life and does not know when he will be released. Father admitted at trial that he would have no place to live and no means with which to support the Child upon his release. Father's extensive criminal history raises serious doubt regarding his "actual willingness to assume custody or financial responsibility for the [C]hild." *In re Kaylene J.*, No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *17 (Tenn. Ct. App. May 26, 2021); *see also In re Bobby B.*, No. E2024-00730-COA-R3-PT, 2024 WL 4458390, at *7 (Tenn. Ct. App. Oct. 10, 2024) (mother failed to manifest ability and willingness where she "continued with her criminal activity and drug abuse[,]" and "these decisions [ ] resulted in the possibility of an eight-year prison sentence for the felony criminal charges pending against her"); *In re Paisley J.*, No. W2022-01059-COA-R3-PT, 2023 WL 4417390, at *11 (Tenn. Ct. App. July 10, 2023) ("Because Father demonstrated a lifestyle fraught with financial instability, persistent illegal drug use, cycles of incarceration, and repeated criminal activity . . . Father failed to manifest an ability and willingness to assume custody of or financial responsibility for the Children.").

For largely the same reasons, we also conclude that Petitioners proved the second prong of section 36-1-113(g)(14) by clear and convincing evidence. Given the long period of time the Child has been in Petitioners' custody, and Father's precarious, transient lifestyle, the Child would be at risk of substantial harm, both physical and psychological, if returned to Father's custody. Particularly disturbing is Father's flippant attitude about drug abuse and domestic violence within his family. Father described smashing Mother's head into a car window while screaming "F-U" at her in front of the children as "getting lively" and a "little discrepancy." Father indicated no remorse for this type of behavior at trial, and we have great concern about returning the Child to these circumstances.

Consequently, the trial court correctly concluded that Petitioners proved this statutory ground by clear and convincing evidence.

### Best interests

In addition to proving at least one statutory ground for termination, petitioners in a termination case must prove, by clear and convincing evidence, that termination serves the child's best interests. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)). Our termination statutes recognize that "[n]ot all parental misconduct is irredeemable" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interests must

be viewed from the child's, rather than the parent's, perspective."). Further, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

When determining whether termination is in a child's best interests, we refer to twenty non-exclusive factors found at Tennessee Code Annotated section 36-1-113(i)(1)(A)-(T). In this case, the trial court applied the correct statutory factors and engaged in a thorough analysis in its final order:

**(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority.**

[These] minor children have a critical need for stability and continuity of placement throughout the children's minority. The minor children have been in the homes of the Petitioners since on or about July 11, 2022. Mother and Father have failed to address their illegal drug use and provide a stable home environment for the children that is drug free. Father is still incarcerated, and he does not know when he will be released. Mother and Father have failed to demonstrate any understanding of the children's need for stability and continuity. The Court finds that Mother and Father have not effectively bonded with the minor children. The minor children are now thriving in the homes of the Petitioners, and they live next to each other. The minor children are now in stable, loving, and healthy environments with the Petitioners. As these young children age, their needs will only increase. Termination of the Respondents' parental rights will increase the minor children's stability and allow the children to have stable placements throughout their lives.

**(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition**.

The young minor children have lived with the Petitioners since on or about July 11, 2022. Based upon their young age, the Petitioners are the individuals who have provided the most consistent emotional, psychological, and medical support for these children. Neither Mother nor Father have demonstrated that they can provide a stable environment that would promote the children's emotional, psychological and/or medical needs. The court finds that a change of caregivers would dramatically and adversely [a]ffect the children's best interests. The Petitioners have provided positive, loving and stable physical environments and have been supportive of the children's emotional, psychological, and/or medical needs. The minor children have improved since going into the Petitioners' care. As the children age, their needs will only increase. This includes educational needs and mature

emotional needs. Mother and Father simply lack the ability and stability to [e]nsure that the children's ongoing and growing needs will be met in their care.

**(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs**.

Mother and Father have failed to demonstrate an ability to consistently provide for the children's material, housing, and safety needs. Mother and Father continue to use illegal drugs and fail drug tests. Mother and Father have not adequately addressed their drug abuse issues. Father has an extensive criminal history, and he was arrested for drug related offenses just prior to trial. Mother and Father have not shown employment, housing and income stability. Father is incarcerated and does not know when he will be released. Mother's and Father's economic circumstances remain unstable and they have not demonstrated an ability to consistently provide for their own needs, much less material, housing, and safety needs of the children. The Court finds that while the children are now young, the needs of the children will only increase as the children age and begin their formal education. Finally, Mother and Father have a toxic relationship and history of abuse in front of the minor children.

**(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment.**

The court finds that Mother and Father failed to offer proof at trial that they have any parental attachment with the children, much less a secure and healthy parental attachment. Based on the proof, the court finds that there is not a reasonable expectation that Mother and/or Father can create such an attachment for the reasons set forth herein including their ongoing drug use as evidenced by the failed drug tests. . . . Father has only seen [the Child] one time since the July 11, 2022 removal.

**(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child.**

The court finds that Mother and Father have failed to maintain regular visitation with the minor children. . . . Father . . . has basically had no meaningful visitation with [the Child] due to his conduct, illegal drug use, and ongoing incarceration. The court finds that Mother and Father have

displayed a "me first" attitude to the detriment of the minor children. Mother and Father have prioritized their drug use and instability over cultivating a positive relationship with the minor children.

**(F) Whether the child is fearful of living in the parent's home.**

The court did not hear much if any proof as related to this factor. However, [the Child] was in the car when Father spray painted Mother's face and she ran Father over in a car. . . . [Father's mother] also testified that Mother and Father argued a lot in front of the minor children. Again, Mother and Father have a toxic relationship and history of abuse in front of the minor children.

**(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms.**

See the court's analysis of factor (F).

**(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent.**

The minor children have been consistently loved and cared for by the Petitioners and their families. The children have greatly benefited from the Petitioners' love and support. The children have also developed a strong bond with the Petitioners[] and their children. The minor children have healthy attachments with Petitioners[] and their family.

**(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage.**

The minor children have developed a positive and loving relationship with the Petitioners['] children and extended family. The Petitioners and minor children live next door to each other, and the minor children are able to play, eat meals and interact on a daily basis. The children are therefore being raised together which is certainly in their best interest. The court finds that the Petitioners seek to adopt, and through their positive relationship and emotional support, the minor children will certainly have access to information about their heritage and extended family.

**(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner.**

The court finds that Mother and Father have shown a lack of positive and/or lasting adjustment of circumstances, conduct, or conditions that would make it safe or beneficial for the children to be returned to their home. Mother and Father continued to fail drug tests after the children were removed. Father was arrested again for drug related offenses shortly before trial and remains incarcerated.

**(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions.**

The Court finds that Mother and Father have failed to take advantage of available programs, services, and/or community resources to assist them in making a lasting adjustment of their circumstances and conduct. . . . [O]n or about August 15, 2023, Father went to English Mountain Recovery through September 14, 2023 for rehabilitation. Thereafter, Father smoked [m]arijuana and failed a drug test. Then, as the trial date was approaching, on or about February 6, 2024, Father was arrested for possession of [m]ethamphetamine, possession of [m]arijuana, and possession of drug paraphernalia. Father pled guilty to possession of drug paraphernalia.

**(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department.**

See factor (K) above.

**(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest.**

See factors (J) and (K) above. Mother and Father have not demonstrated a sense of urgency to regain custody and/or address the circumstances that lead

to removal. Mother and Father continue to fail drug tests, and Father's criminal conduct has continued.

**(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult.**

[The parents'] home environment was volatile, toxic and unhealthy as confirmed by [Father's mother]. The court finds that the relationship between Mother and Father more likely than not detrimentally affected the minor children.

**(O) Whether the parent has ever provided safe and stable care for the child or any other child.**

The court finds that Mother and Father did not provide proof at trial that they ever provided a safe and stable home for the children to reside. . . . Father has another child that he has not seen since 2021. The Court finds that Mother and Father have used illegal drugs at all times material to this case. The Court finds that Mother and Father are unable to provide safe and stable care for the children while abusing illegal drugs and/or under the influence of illegal drugs. Again, Mother and Father have a toxic relationship and history of abuse in front of the minor children.

**(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive.**

See factors (C) (J) and (O) above. The court finds that Mother and Father did not offer proof at trial that they have ever demonstrated the ability or understanding on how to provide for the basic needs and specific needs required for the children to thrive. This is also evidenced by Mother's and Father's continued drug use and Father's continued criminal conduct. Mother and Father do not understand and appreciate what they must do to meet the children's needs including remaining drug free. Father's [criminal] conduct and drug use has led to continued incarceration. The court finds that Mother and Father chose illegal drug use as opposed to meeting the needs of the minor children so as to enable the minor children to thrive.

**(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive.**

- 13 -

See factors (C) (J) (O) and (P) above. Additionally, Mother and Father have not demonstrated the ability and commitment to create and maintain a home that meets the minor children's needs in which the children can thrive.

**(R) Whether the physical environment of the parent's home is healthy and safe for the child.**

Father is incarcerated, and in his words, is "homeless on the streets." . . . Mother's and Father's home environment prior to removal was unstable and volatile as set forth above. Mother's and Father's conduct reflects instability.

**(S) Whether the parent has consistently provided more than token financial support for the child.**

Mother and Father have failed to consistently provide more than token financial support for the children. Neither Mother [nor] Father has paid direct financial support for the benefit of the children since removal.

**(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.**

The court finds that Mother's and Father's mental and/or emotional lack of fitness would be detrimental to the minor children and would prevent Mother and Father from consistently and effectively providing a safe and stable environment in care of the minor children. Again, Mother and Father continue to use illegal drugs and failed drug tests after removal. The court finds that it would be detrimental to place the minor child back into the care of Mother and Father.

Upon analyzing the factors set forth in Tennessee Code Annotated §36-1-113(i)(1), the court finds by clear and convincing evidence that termination of Mother's and Father's parental rights is in the best interests of the minor children. The Guardian Ad Litem agrees. The termination of the Respondents' parental rights and subsequent adoption will promote stability for the children, and allow the children to continue to live in stable and loving home environments that they have enjoyed since July 11, 2022. For well over a year while with the Petitioners, the minor children's needs have been met and they are thriving. The Petitioners, their children, and their family all have a strong bond with the children. Mother and Father have not provided any direct financial support. The children have a right to stable, safe and continuity of placement, and these children have a right to be free from neglect and to be nurtured by appropriate caregivers, or the Petitioners in this

case. Mother and Father cannot rest on their rights while ignoring the rights of their children.

The trial court's findings of fact are apt and supported by the record. Nearly, if not all, of the best interest factors favor terminating Father's parental rights. Father is not fit to assume custody of the Child and has taken no meaningful steps toward being able to do so. Father essentially has no relationship with the Child as he has not seen him since 2022. In the meantime, the Child is bonded with Petitioners' family and is being raised with Mother's other children, the Child's half-siblings. In light of all the foregoing, terminating Father's parental rights is in the Child's best interests. Accordingly, we affirm the trial court.

## CONCLUSION

The judgment of the Circuit Court for Bradley County is affirmed, and this case is remanded for proceedings consistent with this opinion. Costs on appeal are assessed to the appellant, Mark M., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE